IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CA No.: 1:25-cv-01013-DAB-JEP

| | | |
|---|---|---|
| GEORGE BRIAN HAWLEY, on behalf of himself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>O'REILLY AUTOMOTIVE STORES, INC. and OAP Transportation, LLC,<br><br>*Defendants*. | ) | **PLAINTIFF'S FIRST AMENDED COLLECTIVE/CLASS ACTION COMPLAINT** |

COMES NOW, George Brian Hawley ("Named Plaintiff" or "Hawley") on behalf of himself and all others similarly situated, (collectively "Plaintiffs") by and through undersigned counsel, and hereby sets forth this collective action for violation of the Fair Labor Standards Act under § 216(b), and a representative action under the North Carolina Wage and Hour Act pursuant to Fed. R. Civ. P. 23, and alleges as follows:

## PRELIMINARY STATEMENT

1. Plaintiff brings this action on behalf of himself individually and as a collective action against Defendants O'Reilly Automotive Stores, Inc. and OAP Transportation, LLC ("Defendants") under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*., and the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. § 95-25.1, *et seq.,* for not fully compensating employees who work or have worked for Defendants. Defendants had a systemic company-wide policy, pattern, or practice of failing to pay employees for all hours worked, including, but not limited to, pre-shift and

post-shift compensable work activities, uncompensated lunch breaks, unpaid overtime compensation, liquidated damages, and related penalties and damages.

2. Plaintiffs are current and former route drivers for Defendants, classified as hourly employees. Throughout the relevant period, Defendants maintained a corporate policy of failing to compensate route drivers for all hours worked, including "wait time" hours during their scheduled shift, as well as hours up to forty (40) per week and hours in excess of forty (40) per week.

3. Despite notifying Plaintiffs of their hourly non-exempt status through paystubs, employee handbooks, pay practices, and its promise to pay hourly employees for all hours worked including overtime, Named Plaintiff and others similarly situated were not always paid for all of their hours worked, including but not limited to their "waiting time."

4. Specifically, Plaintiff and other similarly situated route drivers did not receive the appropriate promised straight and/or regular rates, premium and/or overtime rate(s) when their hours worked were in excess of forty (40) hours per week, in violation of the FLSA's statutory obligations and the NCWHA's payday statute, as applicable.

5. Defendants are aware of Plaintiffs working generally in excess of forty (40) hours per week, as Defendants have suffered or permitted Plaintiffs to work in excess of forty (40) per week on a regular basis without being properly compensated at one-and-one-half (1.5) times the regular rate for hours worked over forty (40) hours per week.

6. Defendants' practice of failing to compensate Plaintiffs at the appropriate promised overtime rates violates Plaintiffs' rights under the FLSA; and therefore, Named

Plaintiff, on behalf all others similarly situated, seeks statutory overtime wages and the appropriate overtime premiums for all overtime work required, suffered, or permitted by Defendants, liquidated damages, and/or other damages as permitted by applicable law, as well as attorneys' fees, costs, and expenses incurred in this action.

7. Named Plaintiff brings this action for violation of the FLSA as a collective action, pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b), on behalf of the following class:

> All individuals who were, are, or will be employed by Defendants in North Carolina as route drivers or in similar positions, at any time within the three (3) years prior to the date of commencement of this action, through the present, and who were not compensated for all hours worked and/or at the appropriate rate of one and one-half of their regular hourly rate for all hours worked in excess of forty (40) per week.

8. Defendants are liable for its failure to pay Plaintiffs for all work performed, and at the appropriate overtime rate for hours worked in excess of forty (40) per week.

9. Plaintiffs who elect to participate in this FLSA collective action seek compensation at the appropriate overtime rate for all hours worked in excess of forty (40) per week, an equal amount of liquidated damages, and attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

10. Named Plaintiff Hawley, who is a North Carolina resident and who worked for Defendants in North Carolina, also brings this action on his own behalf and as a representative of similarly situated current, former, or future route drivers, or similar positions, employed by Defendants in North Carolina, under the NCWHA. Plaintiffs, who are North Carolina residents and who currently work or have worked for Defendants in

North Carolina, assert that they are entitled to compensation for all work performed for Defendants, whether the work week totaled greater or fewer than forty (40) hours, compensation at the appropriate regular or promised rate for hours worked less than 40 per week, and/or the promised premium rate for all hours worked in excess of forty (40) per week, an equal amount of liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 95-25.13, 95-25.6, 95-25.22(a), (a1), and (d). **These claims are separate and distinct from the FLSA.**

11. Plaintiff seeks class certification under Rule 23 of the Federal Rules of Civil Procedure for the following classes of Defendants' employees in North Carolina:

**Proposed Time Shaving Class**

> All individuals who were, are, or will be employed as hourly route drivers or similar positions based at Defendants' North Carolina Distribution Center, who are paid pursuant to "block value" or "time estimates" for driving time but such driving time does not account for all actual hours worked during workweeks with either less than or in excess of 40 hours per week for at least one week during the relevant time period or two years preceding the filing of the Complaint through the date of judgment (the "Time Shaving Class").

**Proposed Meal Break Deduction Class**

> All individuals who were, are, or will be employed as hourly route drivers or similar positions based at Defendants' North Carolina Distribution Center who were promised an unpaid meal break, but who worked through those meal breaks, and were not compensated for the time spent performing compensable activities during the meal break for at least one meal break in at least one week during the relevant time period or two years preceding the filing of the Complaint through the date of judgment (the "Meal Break Deduction Class").

**Proposed Off the Clock ("OTC") Class**

> All individuals who were, are, or will be employed as hourly route drivers or similar positions based at Defendants' North Carolina Distribution Center, who performed off-the-clock compensable activities at least once prior to the start of shifts or following the end of their shifts during workweeks with either less than or in excess of 40 hours per week, and who were not compensated for the off-the-clock compensable activities, in at least one workweek during the relevant time period or two years preceding the filing of the Complaint through the date of judgment (the "Off-the-Clock" class).

**Overtime Rate Class**

> All individuals who were, are, or will be employed as hourly route drivers or similar positions based at Defendants' North Carolina Distribution Center, who worked in excess of 40 hours per week during at least one workweek during the relevant time period or two years preceding the filing of the Complaint through the date of judgment, but who were not compensated for hours worked in excess of 40 at the promised premium or overtime time-and-a-half rate (the "Overtime Rate" class).

12. Plaintiffs, who are North Carolina residents and who worked for Defendants in North Carolina, assert that they and the putative class, who work or worked in North Carolina for Defendants, are entitled to compensation for any earned and accrued unpaid wages for hours worked at the appropriate straight, promised, or premium overtime rates for hours worked at either less than or in excess of forty (40) per week, and to an equal amount of liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 95-25.6, 95-25.22(a), (a1), and (d).

13. In addition, Named Plaintiff Hawley brings this action to remedy Defendants' unlawful acts upon Named Plaintiff exercising his rights under the Family

Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*., upon Named Plaintiff's need to exercise his rights under the FMLA and FMLA-qualifying leave.

14. Accordingly, Plaintiff seeks all available relief for these claims, including, but not limited to, back pay, front pay, past pecuniary losses, prejudgment interest, compensatory damages, punitive damages, attorney's fees and costs, consequential damages, and all other relief permitted by applicable law.

## PARTIES

15. Defendant O'Reilly Automotive Parts, Inc. ("O'Reilly") is a Missouri corporation with a principal place of business in Springfield, Missouri.[1] O'Reilly is "one of the largest specialty retailers of automotive aftermarket parts, tools, supplies, equipment, and accessories in the United States. . . ."[2]

16. Defendant OAP Transportation, LLC ("OAP") is a Missouri limited liability company with a principal place of business in Springfield, Missouri.[3] OAP operates as a common carrier.

17. Upon information and belief, O'Reilly employs over 90,000 employees. [4] In 2024, O'Reilly made over $16 billion in revenue.[5]

---

[1]*See* Prospectus, O'Reilly Auto Parts (2025), https://www.sec.gov/Archives/edgar/data/898173/000110465925030639/tm258548-1_s3asr.htm#tTHCO
[2] *Id.*
[3]https://bsd.sos.mo.gov/BusinessEntity/BusinessEntityDetail.aspx?ID=4284890&page=beSearch
[4] About O'Reilly Auto Parts, O'Reilly Auto Parts, accessible at: https://corporate.oreillyauto.com/about-oreilly/.
[5] O'Reilly Automotive, Inc. Reports Fourth Quarter and Full-Year 2024 Results, O'Reilly Auto Parts (Feb. 5, 2025), accessible at: https://corporate.oreillyauto.com/2025/02/05/oreilly-automotive-inc-reports-fourth-quarter-and-full-year-2024-results-3/.

18. O'Reilly is an automotive parts retailer with over 6,400 retail locations located throughout North America.[6]

19. O'Reilly operates approximately thirty-one (31) distribution centers throughout its operations in North America.[7] The distribution centers collect and distribute automotive parts and O'Reilly products to O'Reilly retail stores throughout the country.

20. Defendants employ distribution center route drivers (hereinafter "Route Drivers") that drive commercial trucks to deliver retail products to O'Reilly retail stores throughout North Carolina, throughout the region, and throughout the country.

21. Defendants maintain a distribution center at 4750 McConnell Center Drive, Greensboro, NC (hereinafter the "Distribution Center"). Upon information and belief, Defendants operate only one distribution center in North Carolina.

22. At all relevant times, Defendants acted as joint employers with respect to retail of automative parts, as defined in *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125 (4th Cir. 2017) and as set forth below.

23. Named Plaintiff is an adult citizen and resident of the state of North Carolina.

24. Named Plaintiff worked for Defendants as a Route Driver from approximately September 2021 until he was formally terminated on or about March 2025.

25. Named Plaintiff worked as a Relief Route driver from his hiring in September 2021 until approximately April 2024, when he began driving a bid route

---

[6] *See* About O'Reilly Auto Parts, O'Reilly Auto Parts, accessible at: https://corporate.oreillyauto.com/about-oreilly/

[7] *Id.*

between the Distribution Center and Defendants' retail stores in and around Charlotte, North Carolina.

26. The FLSA collective action and Putative Plaintiffs consist of individuals who worked for Defendants as Route Drivers who were not properly paid consistent with the FLSA's statutory overtime requirements or consistent with their promised wages under the NCWHA.

## JURISDICTION AND VENUE

27. The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, based upon the claims brought under the FLSA, 29 U.S.C. § 201, *et seq,* and under the FMLA, 29 U.S.C. § 2611(4).

28. Defendants operate in North Carolina and maintain business locations throughout the state of North Carolina.

29. The United States District Court for the Middle District of North Carolina has personal jurisdiction because Defendants conduct business in Guilford County, North Carolina, which is located within this District.

30. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), inasmuch as Defendants conduct business within the Middle District of North Carolina, and the substantial part of the events or omissions giving rise to these claims occurred in this District.

31. The claims for violations of the NCWHA are based upon the statutory law of the State of North Carolina.

32. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the pendent state claims under the NCWHA because the state law claims arise out of the same nucleus of operative facts as the FLSA claims.

33. All of the alleged causes of action can be determined in this judicial proceeding and will provide judicial economy, fairness, and convenience for the parties.

34. The evidence establishing liability for the causes of action will be similar, and the state law claims will not predominate nor create confusion for a jury.

35. Upon information and belief, during the period relevant to this action, Defendants were employers that employed Plaintiffs, pursuant to the FLSA, FMLA, and NCWHA or their agents, held or implemented the power, *inter alia*, to control the work performance of Plaintiffs, and Defendants directly received the benefit of Plaintiffs' labor.

## COVERAGE

36. At all relevant times material to this action, Defendants were employers within the meaning of the FLSA, 29 U.S.C. § 203(d), the NCWHA, N.C. Gen. Stat. § 95-25.2(5).

37. At all times material to this action, Defendants acted, directly or indirectly, in the interest of an employer with respect to Named, opt-in, and putative Plaintiffs.

38. At all relevant times, Plaintiffs were employees engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §§ 206, 207.

39. At all times material to this action, Defendants were an enterprise engaged in commerce or the production of goods for commerce as defined by the FLSA, 29 U.S.C. §§ 203(s), 203(r), in that said enterprise has had employees engaged in commerce or in the

production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person, and in that said enterprise has had and has an annual gross volume of sales made or business done of not less than $500,000.

40. At all times material to this action, Defendants have been, and continue to be, an "employer" engaged in "commerce or in any industry or activity affecting commerce," which employs fifty (50) or more employees for each working day during each of twenty (20) or more calendar workweeks in the current or preceding calendar year, within the meaning of the FMLA, 29 U.S.C. § 2611(4).

## JOINT EMPLOYER ALLEGATIONS

41. Defendants share the same purpose: to sell automotive aftermarket parts, tools, supplies, equipment, and accessories.

42. On information and belief, Defendant O'Reilly operates automotive retail stores.

43. On information and belief, Defendant OAP is a freight carrier transporting automotive aftermarket parts, tools, supplies, equipment, and accessories between O'Reilly distribution centers and O'Reilly retail stores.

44. On information and belief, Defendant OAP is a wholly owned subsidiary of Defendant O'Reilly.

45. On information and belief, Defendants share responsibility over functions

ordinarily carried out by an employer such as payroll and onboarding.[8]

46. On information and belief, Defendants share responsibility to direct Plaintiffs and modify the terms and conditions of employment.

47. On information and belief, Defendants share the same principal office mailing address in Springfield, Missouri.[9]

48. On information and belief, Defendants share the same registered agent office in Raleigh, North Carolina.[10]

49. The work performed by Plaintiffs is integral to all Defendants.

## WAGE-RELATED FACTUAL ALLEGATIONS

### Route Driver Compensation Terms

50. Route Drivers may either drive relief (or reserve) routes ("**Relief Route Drivers**") or bid routes ("**Bid Route Drivers**").

51. Route Drivers are classified as hourly employees, as demonstrated by their paystubs and O'Reilly's employment handbook.

52. All routes are assigned a value that approximately corresponds to driving time and/or other work compensated as a part of that assigned route (the "Route Value").

53. By way of example, a driver may be assigned a route from the Distribution Center to Charleston, West Virginia, which includes deliveries to various O'Reilly retail

---

[8] *See, e.g.,* https://www.ziprecruiter.com/c/OAP-Transportation,-LLC-d-b-a-OReilly-Auto-Parts/Job/CDL-A-Home-Daily-Greensboro/-in-Greensboro,NC?jid=77a647c987b84033 (job description for "OAP Transportation, LLC d/b/a O'Reilly Auto Parts").
[9] https://www.sosnc.gov/online_services/search/Business_Registration_profile/16939203; https://www.sosnc.gov/online_services/search/Business_Registration_profile/5655220.
[10] *Id.*

stores along that route. This route may be assigned a Route Value of twelve (12) hours based on *estimated* travel time. However, the Route Value does not correspond to the actual time a Route Driver may take to complete the route. Often, the assigned Route Value underestimates the amount of actual time a Route Driver spends performing compensable tasks.

54. All Route Drivers are compensated by multiplying the driver's hourly rate by the Route Value of their assigned route.

55. All Route Drivers are responsible for operating commercial tractor-trailers or trucks, driving delivery routes, loading and unloading O'Reilly retail merchandise, performing pre-trip and post-trip inspections, and assisting with other delivery-related tasks. When not driving, Route Drivers are encouraged to complete "yard work," including moving materials and assisting in preparing trucks, as well as complete training modules at the Distribution Center.

56. On information and belief, all Route Values include one unpaid thirty (30) minute meal break per shift. Route Drivers are directed to clock out for this break, however, Route Drivers regularly work through this break in order to comply with Defendants' delivery requirements.

**Relief Route Drivers:**

57. Relief Route Drivers are not assigned to a specific route but call the Distribution Center every day at approximately 5 pm to get their shift assignments. In other words, Relief Route Drivers fill in for Bid Route Drivers.

58. Relief Route Drivers are told during the call with the Distribution Center

their scheduled time to arrive on the day of their shift. Relief Route Drivers are instructed to arrive at the Distribution Center between 9 pm and 11 pm.

59. Despite being instructed to arrive between 9 pm and 11 pm, Relief Route Drivers regularly spend approximately anywhere between thirty (30) minutes and up to two (2) hours waiting at the Distribution Center for their trucks to be loaded and for their routes to begin. During this time, Relief Route Drivers complete tasks, including, but not limited to, reviewing training modules, but are typically not compensated for working time and time spent waiting for their shift to begin, despite being required to be present at the Distribution Center before their trucks are loaded.

60. In fact, Relief Route Drivers are not permitted to clock-in until their trucks are loaded and they are able to start driving.

61. Relief Route Drivers drive various routes with varying Route Values. For example, on a given workday, a Relief Route Driver may be assigned to drive a route from Greensboro to West Virginia, and such a route may have a Route Value of twelve (12) hours. However, the Relief Route Driver assigned to this route may take approximately fourteen (14) hours to complete this route.

62. Despite working approximately two (2) or more additional hours beyond the Route Value, Relief Route Drivers are not compensated for this extra time.

**<u>Bid Route Drivers:</u>**

63. Bid Route Drivers are drivers who have bid for a specific, consistent route. Bid Routes are awarded by seniority at a certain time throughout the year.

64. The Route Value in a bid route may include non-driving time. For example,

a Bid Route Driver may be assigned a bid of ten (10) hours, which may include five (5) hours of driving time and five (5) hours of "yard work." "Yard work" includes general preparation of the trucks, including picking up trucks from the mechanic's shop, collecting jacks, straps, and trash located throughout the Distribution Center.

65. The Route Values for Bid Route Drivers also do not take into account the actual time that Bid Route Drivers actually spend driving their routes, waiting for their trucks to load, or performing otherwise compensable activities that exceed the ten-hour Route Value.

**<u>Defendants' Practice of Using Extra Route Time Forms:</u>**

66. Even though Defendants classify Route Drivers as hourly, promises overtime to all employees, and provides a method for Route Drivers to report their additional hours worked, Defendants regularly do not compensate Route Drivers for overtime hours worked, despite Route Drivers having already performed compensable activities for those hours.

67. Despite categorizing Route Drivers as hourly employees via paystubs and employee handbooks, all time compensated through Extra Route Time ("XRT") forms was paid at the regular straight time rate and ***not*** the promised overtime premium rate of time-and-a-half.

68. As a Relief Route Driver, Named Plaintiff filled out the XRT form nearly every day, seeking payment for his overtime hours worked, but was rarely compensated for his additional hours at the promised time and one-half consistent with Defendants' written policies such as the handbook and/or earning statements. As a Relief Route Driver,

Named Plaintiff regularly was not compensated for overtime hours listed on his XRT forms.

69. To the extent compensation for extra hours worked was granted, such granting of the extra hours was arbitrary and not based on Route Drivers' actual hours worked.

**<u>Named Plaintiff's Employment with Defendant:</u>**

70. On or about September 2021, Named Plaintiff began working for Defendants as a Relief Route Driver at the Distribution Center.

71. On or about April 2024, Named Plaintiff began working as a Bid Route Driver. His work as Bid Route Driver ended in or about October 2024 when Named Plaintiff took an extended leave.

**<u>Named Plaintiff's Duties as a Relief Route Driver:</u>**

72. As a Relief Route Driver, Named Plaintiff regularly worked Monday through Friday, five (5) days per week.

*Pre-Trip and Arrival at Distribution Center:*

73. As a Relief Route Driver, Named Plaintiff was regularly instructed to arrive at the Distribution Center between 9 pm and 11 pm for his assigned route. Named Plaintiff regularly arrived at that time.

74. When Named Plaintiff arrived, Named Plaintiff was not permitted to begin his shift until his truck was finished loading. As a result, Named Plaintiff was not able to clock in and begin driving his route until approximately between 11 pm and 1 am. Thus, Named Plaintiff was engaged to wait for his truck to finish loading for approximately on

average **2 hours** from the time he arrived at the Distribution Center.

75. Named Plaintiff was encouraged to spend his waiting time engaged in training modules at the Distribution Center or assisting with various tasks around the Distribution Center, including cleaning, preparing trucks, moving equipment, and/or completing required pre-trip inspections. While Named Plaintiff regularly filled out the necessary forms to be compensated for this additional time, Named Plaintiff was regularly ***not*** compensated for this time spent waiting and conducting trainings.

76. Once Named Plaintiff's truck was finished loading, Named Plaintiff was permitted to clock in and begin driving his route.

77. Thus, in light of Named Plaintiff's pre-shift activities as a Relief Route Driver, Named Plaintiff worked approximately **10 hours every week** of uncompensated time that was otherwise compensable.

*Meal Break and Driving Time:*

78. Named Plaintiff's routes involved transporting O'Reilly retail products and intracompany mail and unloading products and mail at different O'Reilly retail locations on the route. Named Plaintiff's assigned routes typically had a Route Value between approximately ten (10) hours and twelve (12) hours.

79. Such Route Values were based on the approximate amount of time it would take to complete a scheduled route and, on information and belief, did not include time for meal breaks. If Named Plaintiff did not complete his route within its assigned Route Value, he would be reprimanded. However, all drivers had to comply with safety regulations, including driving at a safe speed limit. Moreover, drivers could not anticipate traffic or

accidents or truck malfunctions which could delay driving time. In addition, Route Values did not account for varying differences in load amounts, pallet counts, or the time to unload a given load, which varied frequently between stores and trips.

80. Through their handbook, paystubs, and practices, Defendants promise a thirty (30) minute meal break to all employees.

81. Route Drivers are instructed to clock out and back in for this meal period using the time clocks in their truck. However, in order to attempt to comply with the time limits on the Route Value, Route Drivers would regularly clock out and continue working by unloading their trucks at Defendants' retail stores. If Route Drivers did not complete their routes within the proscribed Route Values, they would be reprimanded.

82. To the best of his recollection, Named Plaintiff recalls rarely receiving a full, uninterrupted meal break.

83. Named Plaintiff typically utilized the entirety of his meal break, the full thirty (30) minutes, to unload his truck to meet Defendants' demands and avoid reprimand.

84. Because of Defendants' policy requiring Route Drivers to clock out during this break, every meal break was spent performing compensable work but was not compensated.

85. Despite Defendants' promise of an uninterrupted, unpaid meal break, Named Plaintiff was not permitted to take the break, and was thus not compensated for this break. This amounts to an additional **2.5 hours** per week that Named Plaintiff performed compensable activities for which he was not compensated.

*Post Trip and Clock Out:*

86. Named Plaintiff typically arrived back at the Distribution Center between approximately 11 am and 1:30 pm. Named Plaintiff would then complete his post-trip inspection and then clocked out.

87. Once clocked out, Named Plaintiff would have to walk into the Distribution Center to return Defendants' electronic log book and fill out XRT forms, which would take approximately between five to fifteen minutes. Approximately once or twice per month, Named Plaintiff would have to complete a maintenance related task after his shift, which would take up to thirty (30) minutes. This time was not compensated. On average, Named Plaintiff estimates these uncompensated compensable activities took on average approximately ten (10) minutes after every shift, or fifty (50) minutes every week.

88. To the best of his recollection, Named Plaintiff estimates that he would regularly exceed the Route Value on his routes due to the length of the route and time required to drive the route and unload products. Named Plaintiff estimates he regularly exceeded the assigned Route Values three to four times per week. He worked a Relief Route between 1.25 hours and 2.75 hours each shift, or an average of 2 hours three to four times per week. Such estimate includes time spent after his shift performing post-trip inspections but does not include time spent waiting for his truck to load. On average, Named Plaintiff estimates this time amounted to approximately 7 extra hours per week that were not compensated.

89. Named Plaintiff was not compensated for time spent working that exceeded the Route Value of his given route.

90. Given his time spent working beyond the Route Value and his post-trip work,

Named Plaintiff was not compensated for an additional **<u>7.83 hours</u>** per week that he worked completing his route, returning equipment, and completing post-shift tasks. This amount does not include time spent waiting for his truck to be dispatched.

91. When the pre-trip work, meal breaks, and post-trip work are averaged together, Named Plaintiff estimates that he was not compensated for an additional **<u>20.33 hours</u>** per week when he worked as a Relief Route Driver.

**<u>Plaintiff's Duties as a Bid Route Driver:</u>**

92. On or around April 2024, Named Plaintiff began working as a Bid Route Driver.

93. As a Bid Route Driver, Named Plaintiff regularly worked Monday through Friday, five (5) days per week.

***Pre-Trip and Arrival at Distribution Center:***

94. Under the terms of this particular bid, Named Plaintiff was compensated for five (5) hours of "yard work," and five (5) hours of driving time per workday.

95. When Named Plaintiff began working as a Bid Route Driver, he would regularly arrive at the Distribution Center between 3 pm and 5:45 pm and clock in to begin his required "yard work" for the day. Therefore, on average, he typically arrived at approximately 4:15 pm.

96. Regularly, Named Plaintiff's truck would be ready to be dispatched at approximately 11 pm. Named Plaintiff would then begin to drive his route.

97. Named Plaintiff would regularly not return after his completed route until between approximately 3:30 am and 6:30 am, or 5 am on average. Thus, on average,

Named Plaintiff estimates that he would regularly work 12.75 hours as a Bid Route Driver.

98. Even though Named Plaintiff would arrive early and begin doing yard work, and on average worked shifts totaling 12.75 hours, he was only compensated at the Route Value of ten (10) hours. In light of the required arrival time, Named Plaintiff was regularly not paid for approximately **2.75 hours** each shift, or **13.75 hours** each week, before beginning his route.

***Meal Breaks:***

99. As a Bid Route Driver, O'Reilly still promised a thirty (30) minute meal break for every shift.

100. Through their handbook, paystubs, and practices, Defendants promise a thirty (30) minute meal break to all employees.

101. Route Drivers are instructed to clock out and back in for this meal period. However, in order to attempt to comply with the time limits on the Route Value, Route Drivers would regularly clock out and continue working by unloading their trucks at Defendants' retail stores. If Route Drivers did not complete their routes within the proscribed Route Values, they would be reprimanded.

102. To the best of his recollection, Named Plaintiff recalls rarely receiving a full, uninterrupted meal break.

103. Named Plaintiff typically utilized the entirety of his meal break, the full thirty (30) minutes, to unload his truck to meet Defendants' demands and avoid reprimand.

104. Because of Defendants' policy requiring Route Drivers to clock out during this break, every meal break was spent performing compensable work but was not

compensated.

105. Despite Defendants' promise of an uninterrupted, unpaid meal break, Named Plaintiff was never permitted to take the break, and was thus not compensated for this break. This amounts to an additional **2.5 hours** per week that Named Plaintiff performed compensable activities for which he was not compensated.

***Post-Trip and Clock Out:***

106. While driving his Bid Route, Named Plaintiff would not arrive back at the Distribution Center until between 3:30 am and 6:30 am. In other words, he arrived on average at approximately 5 am. Named Plaintiff would then complete his post-trip inspection and clock out.

107. Named Plaintiff would then walk to the Distribution Cetner and return his electronic log book and fill out XRT and required forms. These tasks took approximately five (5) and fifteen (15) minutes, or on average ten (10) minutes per shift, or fifty (50) minutes per week.

108. Averaged together, Named Plaintiff estimates that during his time as a **Bid Route Driver**, he was regularly not compensated for an average of 3.42 hours per shift, or **17.08 hours per week** for work he completed that was not included in his assigned Route Value.

**Pay:**

109. At the conclusion of his employment with Defendants, Named Plaintiff

recalls that he was compensated at a rate of $35.70 per hour. [11]

## NCWHA WAGE-RELATED FACTUAL ALLEGATIONS

110. According to the NCWHA, "wages" include bonuses and other amounts promised, including hours up to forty (40) each week (and above forty hours per week), when the employer has a policy or a practice of making such payments. NC Gen. Stat. § 95-25.2(16). Irrespective of any FLSA statutory obligation, Defendants must pay overtime for hours over 40 per week, since such statutory obligation does not cover or protect Plaintiff and Putative Rule 23 class members ***promised*** unpaid, earned, and accrued wages, which are not recoverable under the FLSA.

**Defendants' Compensation Policies and Practices Afforded to All Employees:**

111. Defendants' company policies are communicated to employees including but not limited to Route Drivers and other similarly situated positions through written policies such as a company handbook and/or earning statements

112. Whenever Route Drivers have questions about their compensation practices or any other questions about their employment, management directs them to an employee handbook.

113. Consistent with Defendants' company policies, all Route Drivers are classified as hourly employees, as demonstrated via written policies, including but not limited to, paystubs.

114. The handbook provides that all hourly team members are compensated for

[11] Named Plaintiff does not have records in his possession reflecting his pay rates prior to his last pay rate, however, on information and belief, Defendants have Named Plaintiff's earning statements in its possession.

all time worked, including overtime. It also provides that all team members who work overtime *without* prior approval will be paid for that time. This company policy applies to Route Drivers.

115. Similarly, Defendants promise that all employees, including Route Drivers, will receive one unpaid meal break for each eight-hour shift, ranging from thirty (30) to sixty (60) minutes. Consistent with company policy, if Route Drivers and other similarly situated work through lunch breaks, the company policy requires that Drivers will be paid for such time.

**Meal Break Deduction Pay Pursuant to Defendants' Written Policies (Pursuant to the NCWHA)**

116. Defendants' failure to compensate for all hours worked, including all work performed from the time Plaintiffs clocked in through the time Plaintiffs clocked out, in addition to, work performed during meal breaks up to forty (40) hours per week, has resulted in a failure to pay employees all promised and earned wages.

117. For example, in one workweek where Named Plaintiff worked for five days and worked through his meal breaks even though this time was not compensated, Named Plaintiff and those similarly situated would be due as follows for the meal breaks: $35.70 per hour multiplied by 2.5 unpaid hours worked, this would amount to $89.25 per week, and $4,641.00 (for approximately 52 weeks), and liquidated would amount to double the amount or $9,282.00. This amount does not include pre-judgment interest at 8% from the first date that Plaintiff's unpaid wages became due through the present. As noted elsewhere, the NCWHA is more generous than the FLSA, and the pre-judgment interest is not

recoverable under the FLSA.

**Promised Premium Straight and Premium Pay Pursuant to Defendants' Written Policies Pursuant to the NCWHA**[12]

118. Similarly, Named Plaintiff and others similarly situated were promised premium pay for all hours worked at time and one half, consistent with written policies, suggesting they would be compensated with premium pay for hours over 40 per week (***irrespective*** of O'Reilly's statutory overtime obligation under the FLSA).

119. As a Relief Route Driver, Named Plaintiff estimates he was not compensated for approximately 20.33 hours per week that was spent performing compensable activities, including pre-trip and post-trip compensable work. In one work week where Named Plaintiff worked a full week as a Bid Route Driver but was not compensated at the premium rate for an estimated 20.33 hours of work. In such a work week, Named Plaintiff and those similarly situated would be entitled to 20.33 unpaid hours worked at the promised premium rate of $52.05 per hour amounts to approximately $1,058.18 per week. This amount does not include liquidated damages and prejudgment interest permissible under the NCWHA at 8% interest, which is not recoverable under the FLSA.

120. As a Bid Route Driver, Named Plaintiff estimates he was not compensated

[12] Plaintiff only seeks to recover unpaid promised premium overtime pay on his behalf and those similarly situated for the two years preceding the filing of the complaint because under the NCWHA, Plaintiff *may* obtain the more generous pre-judgment interest, which is not recoverable under the FLSA. Plaintiff does not intend to "double-dip" by seeking overtime under the FLSA during the same timeframe, as an FLSA claim for overtime would be limited to Plaintiff and those similarly situated putative plaintiffs only for the preceding third year (to the extent the Court grants willfulness) and only on behalf of herself and those who consent to participate in the lawsuit immediately after the filing of the complaint.

for approximately 17.08 hours per week that was spent performing compensable activities, including pre-trip and post-trip compensable work. In one work week where Named Plaintiff worked a full week as a Bid Route Driver but was not compensated at the premium rate for an estimated 17.08 hours of work. In such a work week, Named Plaintiff and those similarly situated would be entitled to 17.08 unpaid hours worked at the promised premium rate of $52.05 per hour amounts to approximately $889.01 per week. This amount does not include liquidated damages and prejudgment interest permissible under the NCWHA at 8% interest, which is not recoverable under the FLSA.

## FLSA COLLECTIVE ACTION ALLEGATIONS

121. Named Plaintiff brings the First Count of the instant Complaint as a collective action pursuant to 29 U.S.C. § 216(b), on behalf of himself and all similarly situated employees.

122. Similarly situated employees, for purposes of the FLSA collective action claims, include individuals who were, are, or will be employed by Defendants as Route Drivers, at any time within the three (3) year period before the date of the commencement of this action, through the present, and who did not receive compensation for all hours worked.

123. The members of the proposed collective action, like Named Plaintiff, are Route Drivers, have substantially similar job requirements and pay provisions, and are subject to common practices, policies, or plans that fail to compensate them for all work performed at the appropriate rate.

124. Upon information and belief, there are approximately 100 putative Plaintiffs and or similarly situated current and former route drivers that fall within the scope of the aforementioned FLSA class.

125. The members of the proposed collective action are known to Defendants, are readily identifiable, and may be located through Defendants' records.

126. Pursuit of this action collectively will provide the most efficient mechanism for adjudicating the claims of Named and putative Plaintiffs.

127. Members of the proposed FLSA class, therefore, should be permitted to pursue their claims collectively, pursuant to 29 U.S.C. § 216(b).

128. Pursuant to 29 U.S.C. § 216(b), attached to and filed with the instant Complaint as Exhibit A, is the Consent to File Suit as Plaintiff executed by Named Plaintiff.

129. As this case proceeds, it is likely that other individuals will file consent forms and join as opt-in plaintiffs.

130. Named Plaintiff requests that he be permitted to serve as representative of those who consent to participate in this action and that this action be conditionally certified as a collective action pursuant to 29 U.S.C. § 216(b).

## NCWHA CLASS ACTION ALLEGATIONS PURSUANT TO RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

131. Named Plaintiff brings the Second Cause of Action of the instant Complaint as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and all similarly situated employees, for relief to redress and remedy Defendants' violations of the NCWHA, N.C. Gen. Stat. § 95-25.1, *et seq.*

132. Numerosity: The proposed class is so numerous that joinder of all such persons is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. While the exact number of class members is unknown to Plaintiff at this time, upon information and belief, the class comprises approximately 100 individuals.

133. Common Questions Predominate: There is a well-defined commonality of interest in the questions of law and fact involving and affecting the proposed class, and these common questions of law and fact predominate over any questions affecting members of the proposed class individually, in that all putative class members have been harmed by Defendants' failure to lawfully compensate them. The common questions of law and fact include, but are not limited to, the following:

a. Whether Defendants failed to compensate Plaintiffs consistent with Defendants' company policy to pay Route Drivers for all hours worked and instead compensating them according to their scheduled Route Value time in violation of the NCWHA;

b. Whether Defendants failed to compensate Plaintiff and putative Rule 23 class members for all earned and accrued promised straight and premium and/or overtime wages on their designated payday in violation of the NCWHA;

c. Whether Defendants failed to compensate Plaintiff and putative Rule 23 class members for all earned and accrued wages on their designated payday for required compensable pre-shift activities in violation of the NCWHA;

d. Whether Defendants failed to compensate Plaintiffs all earned and accrued wages on their designated payday for required compensable post shift activities in violation of the NCWHA;

e. Whether Defendants failed to compensate Plaintiffs all earned and accrued wages on their designated payday for required compensable activities performed during lunch breaks in violation of the NCWHA; and

f. Whether Defendants failed to compensate Plaintiffs all earned and accrued wages at their promised premium rate, in violation of the NCWHA.

134. Typicality: The claims of Plaintiff are typical of the claims which could be alleged by any member of the putative class, and the relief sought is typical of the relief which would be sought by each member of the class in separate actions. All putative class members were subject to the same compensation practices of Defendants, as alleged herein, of failing to pay putative class members for all hours worked at the promised hourly rate(s). Defendants' compensation policies and practices affected all putative class members similarly, and Defendants benefited from the same type of unfair and/or unlawful acts as to each putative class member. Plaintiffs and members of the proposed class sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures.

135. Adequacy of Representation: Named Plaintiff is able to fairly and adequately protect the interests of all members of the proposed class, and there are no known conflicts of interest between Named Plaintiff and members of the proposed class. Named Plaintiff

has retained counsel who are experienced and competent in both wage and hour law and complex class action litigation.

136. Superiority: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all class members is impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions engender. Because the losses, injuries, and damage suffered by each of the individual class members may be small for some in the sense pertinent to the class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual class members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially greater than if the claims were treated as a class action. Prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent and/or varying adjudications concerning the individual members of the class, establishing incompatible standards of conduct for Defendants, and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they are not parties. The issue in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

137. Public Policy Considerations: Defendants violated the NCWHA. Just as

current employees are often afraid to assert their rights out of fear of direct or indirect retaliation, former employees may also be fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class action lawsuits provide class members who are not named in the complaint with a degree of anonymity, which allows for vindication of their rights while eliminating or reducing these risks.

138. Pursuit of this action as a class will provide the most efficient mechanism for adjudicating the claims of Plaintiffs and members of the proposed class.

## FMLA FACTUAL ALLEGATIONS

139. Named Plaintiff brings the Third Cause of Action of the instant Complaint on behalf of himself, for relief to redress and remedy Defendants' violations of the FMLA, 29 U.S.C. § 2612, *et seq*.

140. During the course of his employment with Defendants, Named Plaintiff applied for and was approved for intermittent FMLA leave in or about May 2024 to care for his wife, who had a serious health condition.

141. Defendants, by and through their agent and transportation supervisor Mary Martin, told Named Plaintiff that he would generally have to give a two-week notice before utilizing FMLA leave.

142. Because of this information, Named Plaintiff did not attend six (6) medical appointments for his wife that he otherwise would have taken FMLA leave for if he was properly informed of his FMLA rights and if Defendants did not interfere with those rights.

143. Martin also told Named Plaintiff that, in the case of unexpected FMLA leave,

that to take that leave, Named Plaintiff had to notify Martin before 12pm on the day of the leave. On information and belief, Martin told another employee that notification had to be received before 5pm on the day of the leave.

144. On one occasion, Named Plaintiff told Martin that he would need to take leave for his upcoming shift, but did so shortly after 12 pm, and Martin threatened Named Plaintiff with disciplinary action. This contributed to a general discouragement and interference with Named Plaintiff taking FMLA leave for fear of disciplinary action.

145. If Defendants had not interfered with Named Plaintiff's FMLA requests, Named Plaintiff would have structured his leave differently, including taking more time to care for his wife and attend her medical appointments.

146. In October 2024, Named Plaintiff submitted an FMLA leave request for his own serious health condition.

147. Martin and other employees of Defendants called Named Plaintiff and repeatedly threatened to terminate him after he submitted his FMLA paperwork, claiming that they had not received the required medical documentation, despite Named Plaintiff being approved to take FMLA leave.

148. Despite receiving such FMLA documentation, Defendants' management repeatedly harassed Plaintiff throughout his leave with threats of termination.

149. Because of the threats of termination, Named Plaintiff did not return to work from his leave until January 2025. If Defendants had not threatened Named Plaintiff with termination or otherwise interfered with his leave, Named Plaintiff would have structured his FMLA differently. Specifically, Named Plaintiff would have taken less time away from

his employment and would have returned to work having had a full, undisturbed FMLA leave.

150. As a result of Defendants' threats and harassment, Named Plaintiff was not formally terminated until March 2025, despite having exhausted his leave in January 2025.

151. Named Plaintiff was prejudiced by Defendants' interference with his FMLA leave.

## COUNT ONE
### Violation of the Fair Labor Standards Act
### Brought by Plaintiff on Behalf of Himself and All Similarly Situated Employees

152. Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated verbatim.

153. At all relevant times, Defendants have been and continue to be an "employer" engaged in interstate "commerce" and/or in the production of "goods" for "commerce," within the meaning of the FLSA, 29 U.S.C. § 203.

154. At all relevant times, Defendants have employed, and continues to employ, "employee[s]," including Named Plaintiffs, and each of the members of the prospective FLSA Class, that have been, and continue to be, engaged in interstate "commerce" within the meaning of the FLSA, 29 U.S.C. § 203.

155. At all relevant times, Defendants have had gross operating revenues in excess of $500,000.

156. The FLSA, pursuant to §§ 206 and 207, requires each covered employer, including Defendants, to compensate all non-exempt employees at a rate of not less than one and one-half (1.5) times the regular rate of pay for work performed more than forty

(40) hours in a single workweek.

157. Defendants' failure to pay Plaintiffs for all hours worked, and at the appropriate overtime rate for hours worked in excess of forty (40) per week, in weeks where Plaintiffs worked over 40 hours, although, upon information and belief, Defendants knew of its obligations under the law, entitles Plaintiffs to liquidated damages in an amount equal to the amount of unpaid wages under 29 U.S.C. § 216(b), since Defendants cannot show they acted in good faith, and a three (3) year, rather than two (2) year statute of limitations, since Defendants' acts constitute willful violations of the FLSA, within the meaning of 29 U.S.C. § 255(a).

158. As a result of Defendants' unlawful acts, Plaintiffs have been deprived of compensation for all required hours worked, and appropriate compensation for all overtime hours worked, and are entitled to recovery of such amounts, liquidated damages, post-judgment interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 216(b).

159. Plaintiffs and putative plaintiffs each worked more than forty (40) hours in one or more workweeks within the applicable statutory period.

## COUNT TWO
## Violation of the North Carolina Wage and Hour Act
## N.C. Gen. Stat. § 95-25.6
## Brought by Plaintiff on Behalf of Himself and All Similarly Situated Employees

160. Plaintiffs incorporate by reference all preceding paragraphs as if the same were repeated verbatim.

161. The class period for this cause of action is at least two years from the date of the filing of the initial complaint.

162. At all relevant times, Defendants have employed, and/or continues to employ, putative Plaintiffs and Rule 23 class members within the meaning of the NCWHA.

163. Pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.6, it is unlawful for an employer to "suffer or permit" an employee to work without paying all owed, earned, and promised wages, on the employee's regular payday.

164. Additionally, North Carolina law requires every employer to notify employees of the promised wages and the day of payment, as well as to make available a written version of the employment practices and policies regarding promised wages. *See* N.C. Gen. Stat. § 95-25.13(1)-(2).

165. Acceptable measures of providing employees information about promised wages include "an up-to-date employee handbook or other written statement of policies and practices concerning promised wages" or through "payroll records, including check stubs, for wages promised in the form of hourly pay or salary or other form whose terms are readily identifiable from payroll records," and employers are required to pay such promised wages. Notification of Employment, 13 N.C.A.C. 12.0805 (2022).

166. Invariably, ***"[o]nce a promise is made by an employer, that employer must pay all promised wages, including wage benefits, accruing to its employees based on any policy, agreement or practice that the employer has established***." *See* North Carolina Department of Labor, *Promised Wages Including Wage Benefits*, https://www.labor.nc.gov/workplace-rights/employee-rights-regarding-time-worked-and-wages-earned/promised-wages-including.

167. Through its Employee Handbook, Defendants promised to pay for *all* hours

worked, including, but not limited to, overtime hours worked.

168. Pursuant to the NCWHA, N.C. Gen. Stat. §§ 95-25.13 and 95-25.6, Defendants were required to pay Plaintiff and putative class members all wages, when due, for all promised earned and accrued regular, straight, and overtime wages of one and one-half times the promised wage rate, which is a part of all the employees' accrued and earned wages, and which should have been paid when due on the employees' regular payday; this requirement is not covered by the overtime provision under the FLSA.

169. Moreover, the FLSA's Savings Clause pursuant to § 218(a) provides that employers should comply with the more stringent of the FLSA and state wage and hour laws. Because the NCWHA provides more stringent protection than the FLSA, the FLSA does not preempt the NCWHA.

170. Every employer shall maintain complete and accurate records that document, in relevant part, the hours worked each workweek, and all other records required to compute wages. 13 NCAC 12.0801.

171. Defendants intentionally refused to pay all wages due, including wages for all hours worked, as accurately recorded by Plaintiffs, and as outlined in the preceding paragraphs of this Complaint, to Plaintiff and putative class members in violation of the NCWHA.

172. Defendants were aware that Named Plaintiff and putative Plaintiffs were not receiving all straight-time wages for all hours worked up to forty (40), shift differential, bonuses, and/or premium overtime wages for hours worked in excess of forty (40) per week pursuant to the promised straight-time rate and corresponding premium overtime rate.

173. Defendants employed Named and putative Plaintiffs within the State of North Carolina.

174. At all relevant times, Defendants, according to their policies and practices, failed and refused to pay Plaintiffs all owed, earned, and promised wages, including for all work-related activities performed pre and post shift  including through lunch breaks, and at the appropriate promised overtime rate that Named and Putative Rule 23 class members are lawfully entitled to for hours worked in excess of forty (40) in a single workweek according to the NCWHA.

175. Consistent with the above, Defendants' failure to pay Plaintiffs all owed, earned, and promised wages violated N.C. Gen. Stat. § 95-25.6.

176. As a result of Defendants' unlawful policies and practices, Plaintiffs have been deprived of compensation due and owing.

177. Defendants' failure to pay Plaintiffs all owed, earned, and promised wages, even though, upon information and belief, Defendants knew of their obligations under the law, entitles Plaintiffs to liquidated damages in an amount equal to the amount of unpaid wages, under N.C. Gen. Stat. § 95-25.22(a1).

178. Due to Defendants' unlawful acts, Plaintiffs have been deprived of all compensation due under the law, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, and attorneys' fees and costs, pursuant to N.C. Gen. Stat. §§ 95-25.13, 95-25.6, 95-25.22(a), (a1), and (d).

## COUNT THREE
**Interference in Violation of the Family Medical Leave Act ("FMLA")**
**29 U.S.C. § 2601, *et seq*.**

**Brought by Named Plaintiff on Behalf of Himself**

179. Named Plaintiff incorporates by reference all preceding paragraphs as if the same were repeated here verbatim.

180. The FMLA, pursuant to § 2615(a)(1), makes it unlawful for employers to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided under the FMLA.

181. Upon acquiring knowledge that an employee's leave may be for an FMLA-qualifying reason, an employer must provide the employee notice of the employee's eligibility to take FMLA leave within five business days. *See* 29 CFR § 825.300 (b)(1)

182. Refusing to authorize FMLA leave, discouraging an employee from using such leave, and manipulating to avoid responsibilities under the FMLA are qualifying examples of forbidden interference with an employee's right to seek FMLA leave. *See* 29 CFR § 825.220 (b).

183. At all relevant times, Defendants have been and continue to be a "covered employer" engaged in "commerce" and/or in the production of "goods" for "commerce," within the meaning of the FMLA, 29 U.S.C. § 2611(4)(A)(i).

184. At all relevant times, Defendants have employed, and continue to employ, "employee[s]," including Named Plaintiff, within the meaning of the FMLA, 29 U.S.C. § 2611(2)(A).

185. The FMLA, pursuant to §§ 2612 and 2613, entitles all eligible employees to a total of twelve (12) workweeks of leave during any twelve (12) month period for "a serious health condition that makes the employee unable to perform the functions of the

position of such employee" and/or in order to care for a spouse with a serious health condition.

186. Named Plaintiff was entitled to take FMLA leave in 2024 in order to care for his spouse, who had a serious health condition. *See* § 2612(a)(1)(C).

187. Named Plaintiff was entitled to take FMLA leave later in 2024 because of his own serious health condition that made him unable to perform the functions of his job as an employee of Defendants. *See* § 2612(a)(1)(D).

188. At all relevant times, Defendants were aware of Named Plaintiff's request and/or need for accommodation in connection with his FMLA-related requests.

189. Through its agent, Mary Martin, Defendants discouraged and prevented Named Plaintiff from taking FMLA leave for which he was eligible.

190. Had Defendants not interfered, discouraged, or prevented Named Plaintiff from taking FMLA, Named Plaintiff would have structured his leave differently. In early 2024, Named Plaintiff would have taken more time to care for his wife if Defendants had not interfered with his FMLA rights. In late 2024, if Named Plaintiff was able to experience FMLA leave without threats of termination and harassment, he would have come back to work sooner and not exhausted his FMLA leave. In both cases, Named Plaintiff would have structured his leave differently if not for Defendants' interference.

191. Named Plaintiff was prejudiced by Defendants' interference with his FMLA leave.

192. Defendants' unlawful conduct, as alleged above, entitles Plaintiffs to liquidated damages in an amount equal to the amount of any wages, salary, employment

benefits, or other compensation denied or lost to such employee by reason of the violation. 29 U.S.C. § 2617.

**PRAYER FOR RELIEF**

WHEREFORE, Named Plaintiff, on behalf of himself and all those similarly situated, prays that this Honorable Court:

1. Issue an Order certifying this action as a collective action under the FLSA, and designate Named Plaintiff as representative of all those similarly situated under the FLSA collective action;

2. Issue an Order certifying this action as a class action under the NCWHA, and designate Named Plaintiff as representative on behalf of all those similarly situated under the NCWHA class;

3. Award Plaintiffs and all those similarly situated actual damages for all unpaid wages found due, and liquidated damages equal in amount, as provided by the FLSA, 29 U.S.C. § 216(b), and pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(a1);

4. Award Plaintiffs and all those similarly situated pre- and post-judgment interest at the statutory rate, as provided by the FLSA, 29 U.S.C. § 216(b), and pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(a) as applicable;

5. Award Plaintiffs and all those similarly situated attorney's fees, costs, and disbursements as provided by FLSA, 29 U.S.C. § 216(b), and pursuant to the NCWHA, N.C. Gen. Stat. § 95-25.22(d);

6. Award Named Plaintiff all wages, salary, benefits, or other compensation denied to or lost by Plaintiff, and monetary losses sustained, as a result of Defendants'

unlawful actions under FMLA;

7. Award Plaintiff's interest at the prevailing rate, as provided under 29 U.S.C. § 2617(a)(1)(A)(ii) and N.C. Gen. Stat. § 95-243(c);

8. Award Plaintiffs all consequential damages due as a result of Defendants' unlawful acts;

9. Award Plaintiffs punitive damages for Defendants' willful, wanton, and malicious conduct;

10. Grant such further legal and equitable relief as the Court deems necessary and proper in the public interest.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this February 17, 2026.

*/s/Gilda Adriana Hernandez*
Gilda A. Hernandez (NCSB No. 36812)
Samuel Byron Frazelle (NCSB No. 59771)
Laura Fisher (NCSB No. 62357)
**THE LAW OFFICES OF GILDA A. HERNANDEZ, PLLC**
215 S. Academy Street
Cary, NC 27511
Tel: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
sbfrazelle@gildahernandezlaw.com
lfisher@gildahernandezlaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

This is to certify that on February 17, 2026 a true and correct copy of the foregoing **PLAINTIFF'S FIRST AMENDED COLLECTIVE/CLASS ACTION COMPLAINT** was delivered via the CM/ECF system to the following:

CHRISTOPHER A. PAGE
N.C. State Bar No. 19600
MATTHEW C. BURKE
N.C. State Bar No. 52053
LUKAS EPPS-DAWSON
N.C. State Bar No. 62344
3101 Glenwood Ave, Suite 200
Raleigh, North Carolina 27612
Telephone: (919) 782-6860
Facsimile: (919) 782-6753
E-mail: chris.page@youngmoorelaw.com
E-mail: matt.burke@youngmoorelaw.com
E-mail: lukas.epps-dawson@youngmoorelaw.com
*Attorneys for O'Reilly Automotive Stores, Inc.*

*/s/ Gilda Adriana Hernandez*
Gilda A. Hernandez (NCSB No. 36812)
Matthew S. Marlowe (NCSB No. 60035)
Briahna B. Koegel (NCSB No. 62491)
**THE LAW OFFICES OF GILDA A. HERNANDEZ, PLLC**
215 S. Academy St.
Cary, NC 27511
Tel: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
mmarlowe@gildahernandezlaw.com
bkoegel@gildahernandezlaw.com
*Attorneys for Plaintiffs*